**SO ORDERED.**

**SIGNED this 11 day of June, 2009.**



_Dale L. Somers_
Dale L. Somers
**UNITED STATES BANKRUPTCY JUDGE**

___

Opinion Designated for Electronic Use, But Not for Print Publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| In Re: | |
| GEORGE EMERSON HOKE, PAULA KAY HOKE, | CASE NO. 05-41590-7 CHAPTER 7 |
| DEBTORS. | |
| UNITED STATES TRUSTEE, PLAINTIFF, | |
| v. | ADV. NO. 08-7037 |
| GEORGE EMERSON HOKE, DEFENDANT. | |

**OPINION DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

This proceeding is before the Court on the United States Trustee's motion for summary judgment on the second count of its complaint against Debtor George Emerson Hoke. The U.S. Trustee appears by counsel David P. Eron. The Debtor appears by

counsel Joseph A. Knopp. The Court has reviewed the relevant materials and is now ready to rule.

In this proceeding, the U.S. Trustee seeks to revoke the Debtor's discharge under 11 U.S.C.A. § 727(d)(2) because he acquired property of the bankruptcy estate or became entitled to acquire property that would be property of the estate and, allegedly "knowingly and fraudulently," failed to report the acquisition of or entitlement to such property, or to surrender the property to the Chapter 7 trustee. The Debtor disputes only whether he acted fraudulently, as required to bring his actions under § 727(d)(2). Although the U.S. Trustee has submitted materials that could well support a finding at trial that the Debtor acted with the necessary fraudulent intent, the Court concludes the materials do not establish that a reasonable factfinder would have to find that the Debtor acted with that intent. Consequently, the U.S. Trustee's motion for summary judgment must be denied.

**FACTS**

The Debtor has not contested any of the facts the U.S. Trustee contends are undisputed. The following statement of facts is based on the U.S. Trustee's statement of facts, supplemented and sometimes modified by facts contained in the attachments to the statement and by pleadings filed in the Debtor's main bankruptcy case.

In 1999, for estate-planning purposes, the Debtor's mother deeded her home to her five children as joint tenants, retaining only a life estate for herself.[1] The deed stated it

---

[1] The Court observes that transferring fee ownership of property to one's children and retaining only a life estate is an informal estate planning device once frequently used in Kansas. It is rarely used today.

gave the property to the children "AS JOINT TENANTS and not as tenants in common, with full rights of survivorship, the whole estate to vest in the survivor(s) in the event of the death of any one or more," subject to the mother's life estate. After that, her children, including the Debtor, paid the insurance, tax, and maintenance expenses for the home. Before he and his wife filed their joint Chapter 7 bankruptcy petition, the Debtor considered disposing of his interest in the home, but ultimately did not. They filed their bankruptcy petition on May 19, 2005. At that time, the Debtor's mother was 88 years old.

On the original bankruptcy schedules, the Debtor listed his interest in the subject property as personal property on Schedule B, identifying the property by its address on Chestnut Street in McPherson, Kansas, ("Chestnut Property") and stating the value of his remainder joint-tenant share to be $0. At the meeting of creditors, the Debtor testified the Chestnut Property was worth $50,000 and confirmed he had an ownership interest in it. The Chapter 7 trustee asked him to amend his schedules to list the interest as a real property interest. He filed amended schedules about a month later, moving the Chestnut Property to Schedule A, the real property schedule, but using the same description and valuation as before. As with all Chapter 7 cases filed in the District of Kansas, the initial notice sent to creditors to notify them of this case said there did not appear to be any property available to pay creditors, so they should not file proofs of claim.

At some unspecified time in 2005, the trustee asked the Debtor's attorney to supply a copy of the deed to the Chestnut Property and a statement about its market value.

3

She renewed this request at an unspecified time in 2006, and in May 2006, the Debtor's attorney transmitted a typed letter,[2] dated May 6, 2006, and signed by the Debtor, that addressed various matters, including the Chestnut Property. The Debtor stated he held an interest as a joint tenant with four siblings, and estimated the property was worth $50,000. He said his mother had a life estate, was 88 years old, lived there alone, and was in reasonably good health. He added, "[M]y interest therein was derived for inheritance purposes only, and as such, according to statute, is exempted from claims by any creditors in a bankruptcy proceeding."

    About a month later, the trustee sent a letter dated June 19 to the Debtor's attorney, asking him to tell the Debtor the Chestnut Property was not exempt, but that he could make an offer to buy it from her if he wanted to. About five weeks after that, the trustee sent the attorney another letter, pointing out that she had not received an offer from the Debtor and asking for the names and addresses of the other joint owners of the Chestnut Property. On August 23, 2006, the trustee filed a motion to compel production of the names and addresses of the holders of the other joint interests in the Chestnut Property. An order granting that motion was not entered until December 7, and the Debtor's attorney provided the names and addresses a week after the order was entered. The order said it was granting the August 23 motion, but nothing in the materials says the trustee ever contacted any of the Debtor's siblings after receiving their names and addresses.

---

[2]Ex. A to Ex. 18 in support of U.S. Trustee's motion, pp. 148-49.

The trustee submitted the order only after the Clerk's Office issued a "Notice of Deadline for Submission of Pleading" seeking an order on the motion to compel. Copies of both that notice and the subsequent order were mailed to the Debtor.

The Debtor's attorney sent the trustee a letter dated September 12, 2006, stating his view that the Debtor had no equitable interest in the Chestnut Property that the trustee could sell. Relying on a decision of the Kansas Court of Appeals, *Walnut Valley State Bank v. Stovall*,[3] the attorney argued the Debtor's legal interest to the property had been created merely for the convenience of the owner, his mother, as an estate planning tool, and a creditor could not garnish the property and take it away from the owner. Consequently, he concluded, the Chestnut Property was not property of the Debtor's bankruptcy estate. A notation at the bottom of the letter indicates a copy of it was mailed to the Debtor.

The trustee spoke with the Debtor's attorney on September 28, 2006, about the Debtor's interest in the Chestnut Property. No specific information about this conversation has been submitted. On October 31 and November 14, the trustee's assistant contacted the Debtor's attorney by e-mail to ask about the age of the Debtor's

---

[3]*Walnut Valley State Bank v. Stovall*, 1 K.A. 2d 421 (1977). Unlike the case before this Court, which involves the value of a joint-tenant-remainderman's ownership interest while a third party holds the life estate, *Walnut Valley* involved the extent of the ownership interests of joint tenants not subject to any life estate. The Kansas Court of Appeals held a joint tenancy bank account could be garnished for the debt of one of the co-owners only to the extent of that owner's equitable interest. Although the attorney cited only the court of appeals decision, the decision was later affirmed in part and reversed in part by the Kansas Supreme Court, 223 Kan. 459 (1978), where the court held that: (1) the garnishment severed the joint tenancy, (2) a rebuttable presumption of equal ownership between the cotenants then arose, and (3) any party wishing to overcome that presumption would have the burden of proving the ownership was not equal.

5

mother.

The Debtor's attorney sent the trustee a letter dated November 18, 2006. In it, the attorney indicated he would contact the Debtor's siblings to see if they might be interested in buying the Debtor's interest in the Chestnut Property, repeated his argument based on *Walnut Valley State Bank v. Stovall*, and added several other arguments. He suggested the Debtor would receive an interest in the Chestnut Property only if he survived all four of his siblings, and offered a method of calculating the value of that interest that led to a value of $30. He cited Bankruptcy Judge Benjamin Franklin's decision (applying Kansas law) in *In re Crouch C Stores, Inc.*, that despite a joint tenancy deed, a Chapter 11 debtor had only a bare legal interest and no equitable interest in her mother's residence because the joint tenancy had been created as an estate planning device to avoid probate and not to give the debtor a present interest in the residence, so the debtor's bankruptcy estate was not entitled to any of the proceeds from the mother's sale of the property.[4] The attorney also said K.S.A. 59-2291(a)(8) would authorize the Debtor to disclaim his interest in the joint tenancy, and he was thinking that might be the Debtor's best option to avoid the burden the trustee was placing on the Debtor's mother and her children. Attached to the letter was a 2006 valuation notice for the Chestnut Property from the county appraiser; the notice stated the property owner was the Debtor "ETAL." The Debtor received a copy of his attorney's letter.

---

[4] 120 B.R. 178, 180-81 (Bankr. D. Kan. 1990). Like *Walnut Valley*, *Crouch* involved the extent of joint tenants' ownership interests that were not subject to any life estate.

The U.S. Trustee asserts that before December 31, 2006, the Debtor "knew that the trustee was planning to take possession of [the Debtor's] interest in the Chestnut Property for the benefit of creditors." The Court believes this overstates what the U.S. Trustee's materials show the Debtor knew at that point. The Debtor knew his attorney had sent the trustee a letter in November 2006 arguing (1) the bankruptcy estate had no interest in the property, (2) its limited interest was worth almost nothing, and (3) the Debtor could disclaim the interest and prevent the trustee from making further claims against the Chestnut Property. Nothing in the materials presented suggests the Debtor knew by the end of December that year that the trustee was rejecting all those arguments, or that the arguments were not viable. In fact, nothing after entry of the December 7, 2006, order compelling the Debtor to provide the trustee with the names and addresses of his siblings indicates that the trustee mentioned the Chestnut Property to the Debtor or his attorney from December 2006 until January 2008.

On February 27, 2007, the Chapter 7 trustee filed a notice stating she had "recovered assets or discovered potential assets believed to have a value sufficient to warrant administration," and an order was issued the same day fixing a time for creditors to file proofs of claim. A copy of the order was mailed to the Debtor a couple of days later. Neither the trustee's notice nor the order described any specific asset. On March 15, the trustee filed a motion for turnover of a $2,695 real estate commission she claimed the Debtor was entitled to on the day he filed for bankruptcy because a sales contract had been signed prepetition. The motion did not mention the Chestnut Property. The Debtor

7

objected to turnover, saying the commission had not been earned until the sale closed about a week after he filed for bankruptcy. The commission was from a sale of real property in Buhler, Kansas ("Buhler Sales Commission"). The Debtor's attorney and the trustee made various efforts between April and September 2007 to resolve the dispute over the Buhler Sales Commission. The Debtor did not pay the commission to the trustee.

In about March 2007, the Debtor's mother became ill and moved into a nursing home. Soon after that, she indicated she no longer wished to live in the Chestnut Property and agreed her life estate should terminate. At that time, the Debtor did not advise either his attorney or the trustee of his mother's decision to give up her life estate.

In May 2007, the Debtor's attorney provided him with copies of court opinions he thought were relevant to the Debtor's case. Within a few days, the Debtor sent him an e-mail message, dated May 24, with a response attached. Neither the e-mail itself nor the name of the attachment suggested the attachment concerned the Chestnut Property, but the attorney would have known one or more of the cases he had sent to the Debtor did concern that property. In the attachment,[5] also dated May 24, the Debtor said he thought one court opinion should support his position about the Chestnut Property because, among other things, "remainder interests have little if any marketable value actuarially." He suggested the fact his remainder interest in the Chestnut Property was disclosed in his

---

[5] Ex. 15 in support of U.S. Trustee's motion, at 98.

bankruptcy schedules but nothing was said about it before his discharge in September 2005 seemed to indicate "the court also agreed that it was exempt," and he further indicated he thought the notice of the meeting of creditors in his case meant the trustee was making a statement to creditors "that the court had <u>found no assets</u> to be distributed." The Debtor also reported that his mother was in an extended care facility, that his siblings would all be visiting for the weekend, and that they intended to put the Chestnut Property on the market as soon as his mother's assets could be removed from it. He said his sister had "a verbal and unrecorded lien" against his interest in the property to repay a personal loan, so he thought he would get little or nothing from the sale and would probably just give her his portion of the proceeds. He added that he thought they would be lucky if the property brought $40,000, which would be further reduced by a brokerage fee and closing expenses.

     On May 28, 2007, the Debtor's siblings each gave him a power of attorney so he could sign documents selling their interests in the Chestnut Property. Some time that month, the Debtor contacted Michael A. Rausch, a title agent with Security Title Company, and asked him to help with the sale of the Chestnut Property. According to Rausch, the Debtor thought his mother's oral statement giving up her life estate would be sufficient to permit a sale of the property, but Rausch told him she would have to sign a quitclaim deed for a sale to occur. She signed one on June 11. On June 2, 2007, the Debtor signed a listing agreement for the Chestnut Property, with an asking price of $49,000, and himself as the listing agent. At that time, he knew he was one of the owners

9

of the property. On June 21, the Debtor sent his attorney an e-mail message[6] asking whether he needed to appear for a court hearing a few days later; in the message, he also mentioned having responded to "case studies" the attorney had sent to him but said he had not heard from the attorney about that. On June 22, a buyer signed a contract to purchase the Chestnut Property for $48,000. The next day, the Debtor sent his attorney another copy of the attachment to his May 24 e-mail. However, he modified the attachment to include information about the pending sale of the Chestnut Property, including the sale price, expected closing date, and the amount of the proceeds he expected to receive.

The U.S. Trustee submitted Rausch's affidavit to support some of his facts.[7] Rausch said he had heard from various sources that the Debtor had filed for bankruptcy, so he asked him about the bankruptcy case at a meeting in his office in the first half of July 2007. He said the Debtor had not told him about the bankruptcy case before, but admitted during the meeting that he was in bankruptcy. Rausch said the Debtor told him the bankruptcy would have no impact on the sale of the Chestnut Property because it was his mother's home and the money was going to be used for her future care, but Rausch told him he owned one-fifth of the property under the 1999 deed from his mother. Rausch said he told the Debtor that "[T]he bankruptcy court is god," and that he needed to make sure there was no bankruptcy claim. He said the Debtor told him the Chestnut

---

[6] Ex. 15 in support of U.S. Trustee's motion at 99.

[7] Ex. 17 in support of U.S. Trustee's motion, pp. 133-37, plus attachments, pp. 138-41.

10

Property would not be an asset of the bankruptcy case because everything had been handled by the bankruptcy court over the last two years, but Rausch stated he insisted Security Title needed something from the bankruptcy court showing the property was free and clear of any claims in the bankruptcy case. Rausch asserts that the Debtor never referred to the Chapter 7 trustee in his case "nor the ongoing dispute he was having with the trustee concerning the Chestnut Property." After that conversation, Rausch maintains the Debtor gave him a copy of his discharge, dated September 27, 2005, and represented that it proved his bankruptcy case had no claim against the property. Rausch said he believed the Debtor's representations and accepted the discharge as proof the bankruptcy case involved no claim against the property because he had known the Debtor for a long time and trusted that the Debtor was telling him the truth. Apparently accepting the Debtor's representations about his bankruptcy discharge, Security Title issued a title insurance policy in connection with the sale of the Chestnut Property. Rausch said the Debtor never mentioned to him a claim his sister had against his interest in the Chestnut Property for money she had loaned him. Rausch said he advised the Debtor to retain his share of the proceeds from the sale of the Chestnut Property in case any complications arose in his bankruptcy case. Rausch added that none of the proceeds from the sale were paid directly to the Debtor's mother, and that nothing from the Debtor's share of the proceeds was paid directly to his sister.

    The sale of the Chestnut Property closed on July 20, 2007. The Debtor received $8,552.54 from the sale for his one-fifth interest in the property. As the listing agent, he

also received 70% of his broker's share ($1,920) of the realtors' commission on the sale, or about $1,344. Within a week of the closing, the Debtor gave $7,000 from his share of the sale proceeds to his sister. In March 2008, he testified he gave the money to his sister as a gift. He never told the trustee his sister had any kind of lien against his share of the Chestnut Property. He also testified that "[W]hen it finally did come time to market the [Chestnut Property], we proceeded on the basis of understanding that if the Court had made no physical recorded claim against the property that it apparently at that point had no intention of it."[8]

At unspecified times during the trustee's negotiations with the Debtor's attorney about the bankruptcy estate's claim to the Buhler Sales Commission, the attorney represented that the Debtor had very limited financial resources with which to pay any amount to the estate to settle the claim. On August 15, 2007, the trustee had a telephone conference with the Debtor and his attorney about possibly settling the claim. At no time during the negotiations did the Debtor disclose that he had received almost $10,000 from the July sale of the Chestnut Property; of course, by August 15, he had already given his sister $7,000 from his share of the sale proceeds. The parties ultimately agreed to settle the claim to the Buhler Sales Commission for $1,000. The trustee filed a motion to approve the settlement on September 21, 2007, and the Debtor paid her the $1,000 a few days later.

---

[8]Ex. 19 in support of U.S. Trustee's motion, at 189 ll. 4-9.

12

On January 30, 2008, the trustee discovered the Chestnut Property had been sold when her assistant obtained a current tax statement for the property that showed it was no longer owned by the Debtor and his siblings. The trustee immediately contacted the Debtor's attorney to demand turnover of the proceeds the Debtor had received from the sale of the property. When the attorney contacted the Debtor about that demand, the Debtor told him for the first time that the sale of the Chestnut Property had closed. The attorney never told the Debtor the Chestnut Property was not subject to any interest of the trustee, the Chapter 7 estate, or the Court. The Debtor never turned any of the proceeds over to the trustee.

The trustee contacted Security Title to demand turnover of the amount that had been paid to the Debtor as a co-owner of the Chestnut Property. In April 2008, Security Title's insurance company paid $8,552.54 to the bankruptcy estate to satisfy that demand.

**DISCUSSION**

*1.     § 727(d)(2) of the Bankruptcy Code*

The U.S. Trustee seeks summary judgment on his second claim for relief, which is based on § 727(d)(2). Under that provision, "the court shall revoke a discharge granted under [§ 727(a)] if — . . . (2) the debtor acquired property that is property of the estate, or became entitled to acquire property that would be property of the estate, and knowingly and fraudulently failed to report the acquisition of or entitlement to such property, or to deliver or surrender such property to the trustee." The U.S. Trustee has the burden of

13

proof under this provision.[9] The Debtor's defense is that he did not act with the requisite intent when he sold his interest in the Chestnut Property and disposed of the proceeds he received without reporting to the trustee.

*2.    Summary judgment standards*

Under the applicable rules of procedure, the Court is to grant summary judgment if the moving party demonstrates that there is "no genuine issue of material fact" and that the party "is entitled to a judgment as a matter of law."[10] The substantive law identifies which facts are material.[11] A dispute over a material fact is genuine when the evidence is such that a reasonable factfinder could resolve the dispute in favor of the party opposing the motion.[12] In adjudicating disputes, bankruptcy courts usually both determine the law and find the facts. In deciding a summary judgment motion, though, the Court is limited to its role of deciding legal questions, not weighing the evidence and resolving factual disputes, but merely determining whether the evidence favorable to the non-moving party about a material fact is sufficient to require a trial[13] at which the Court would act in its factfinding role. Summary judgment is inappropriate if an inference can be drawn from the materials properly submitted either to support or oppose the motion that would allow

---

[9]Fed. R. Bankr. P. 4005.

[10]Fed. R. Civil P. 56(c), made applicable by Fed. R. Bankr. P. 7056.

[11]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[12]*Id.*

[13]*Id.* at 249-50.

14

the non-moving party to prevail at trial.[14]

As a general rule, questions involving a person's intent or other state of mind cannot be resolved by summary judgment.[15] But in an exceptional case, a person's "denial of knowledge may be so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe it," making a trial on the question of the person's state of mind unnecessary.[16] The U.S. Trustee asks the Court to conclude this is one of those exceptional cases where the Debtor's claim he believed he was free to sell his interest and dispose of the proceeds without accounting to the trustee or the bankruptcy estate is "so utterly implausible . . . that no rational person could believe it."

3. *The Debtor's state of mind in selling the Chestnut Property*

The U.S. Trustee contends the Court must infer that the Debtor acted knowingly and fraudulently because he knew from the beginning of his bankruptcy case that the Chapter 7 trustee might liquidate his interest in the Chestnut Property. While it is clear the Debtor knew when he filed for bankruptcy that the trustee might claim that interest, several things suggest that by the time the Debtor and his siblings sold the property, he might have believed the trustee had decided against pursuing it. First, in letters to the

---

[14]*See id.* at 248.

[15]*Prochaska v. Marcoux*, 632 F.2d 848, 851 (10th Cir. 1980), *cert. denied* 451 U.S. 984 (1981); *see also* 10B Wright, Miller & Kane, *Fed. Prac. & Pro. Civil 3d*, §2730 (1998) (indicating actions involving state of mind can rarely be determined by summary judgment, except when the opposing party does not present sufficient circumstantial evidence to support a potential finding contrary to the person's professed state of mind).

[16]*In re Chavin*, 150 F.3d 726, 728-29 (7th Cir. 1998).

15

Case 08-07037    Doc# 29    Filed 06/11/09    Page 15 of 20

trustee (which the Debtor received copies of), the Debtor's attorney made several arguments asserting that the bankruptcy estate had no interest in the Chestnut Property, or if it did, that the interest was nearly worthless. The last of these letters was dated November 18, 2006, and after the order requiring the Debtor to provide the names and addresses of his siblings was entered on December 7, 2006, nothing presented to the Court shows the trustee even mentioned the Chestnut Property to the Debtor or his attorney from that date until the Debtor listed the property for sale on June 2, 2007, almost six months later. No matter how attorneys might evaluate the arguments made in that letter, the materials presented do not indicate the Debtor, who is not a lawyer, somehow knew they were wrong. The trustee never sought a ruling from the Court about the validity of any of the arguments, and the Debtor might have interpreted the December 7 order to concern only the trustee's position before she received the November 18 letter. The Debtor's May 24, 2007, attachment to his e-mail to his attorney indicates he might still have believed the trustee was pursuing his interest in the Chestnut Property, but does not make it "utterly implausible" to think he did not. Second, the Debtor testified that when he went about selling the Chestnut Property, he thought the fact nothing had been filed in the public title records showing the "Court" had an interest in the property meant the Court had determined his bankruptcy case would have no effect on the property. Nothing in the materials conflicts with the possibility the Debtor believed this, or establishes the Debtor knew this understanding was wrong. Third, the Debtor's attorney points out the trustee did not include the Chestnut Property in the March 2007 motion for

16

turnover in which she sought to recover the Buhler Sales Commission, and suggests the Debtor took that to mean the trustee was abandoning her claim to the interest in the Chestnut Property. While attorneys might understand a motion for turnover of a partial remainder interest in real property was not needed for the trustee to sell the interest, the non-attorney Debtor might have believed the omission of his interest in the Chestnut Property from that turnover motion meant the trustee had decided not to pursue the interest. Fourth, in the original May 24, 2007, attachment to an e-mail message the Debtor sent to his attorney, the Debtor included information about the plans he and his siblings had for selling the Chestnut Property, and in the revised attachment he sent a month later, he reported the contract for sale that had been signed on June 22, 2007. While the U.S. Trustee suggests the Debtor was not asking the attorney for advice about selling the property and could not have interpreted the attorney's failure to respond to the information to mean the attorney believed the sale was permissible, the Court is not convinced the materials presented foreclose the possibility the Debtor took that view. Any or all of these circumstances could support a fact finding at trial that the Debtor truly believed — albeit mistakenly — that he was free to sell his interest in the Chestnut Property without informing the trustee or his attorney, and therefore did not act with the knowing and fraudulent intent that is required for discharge revocation under § 727(d)(2). At least one bankruptcy court has ruled after a trial that a debtor who sold real property that belonged to the bankruptcy estate did not do so knowingly and fraudulently as required for § 727(d)(2) to apply, and that ruling was affirmed on appeal as not clearly

17

erroneous.[17]

The U.S. Trustee has cited many decisions about various aspects of proving fraud and inferring fraudulent intent from the circumstances involved in a case. However, only two of the decisions involved rulings made on summary judgment motions, rather than after trials. In *Sholdra v. Chilmark Financial, LLP (In re Sholdra)*, the Fifth Circuit affirmed a summary judgment ruling that denied a debtor's discharge based on false oaths.[18] In that case, the debtor admitted in a deposition that some information in his schedules and statement of financial affairs was false, and then filed no response to a creditor's motion for a summary judgment denying discharge based on a false oath.[19] The Fifth Circuit rejected the debtor's argument that the fact he amended the schedules and statement of financial affairs after the false information was revealed in the deposition raised a genuine issue of material fact about his fraudulent intent in originally reporting the false information.[20] In *Sicherman v. Rivera (In re Rivera)*, (an opinion designated as not for publication) the Sixth Circuit Bankruptcy Appellate Panel affirmed a summary judgment ruling that a debtor had knowingly and fraudulently failed to turn over to the Chapter 7 trustee for his case the full amount he received from a settlement of a

---

[17]*See Schilling v. Reid (In re Reid)*, 2006 WL 2475332 (Bankr. W.D. Ky.2006), *aff'd* 372 B.R. 1 (W.D. Ky. 2007).

[18]249 F.3d 380 (5th Cir. 2001).

[19]*Id.* at 381-82.

[20]*Id.* at 383.

18

Case 08-07037    Doc# 29    Filed 06/11/09    Page 18 of 20

prepetition personal injury claim.[21] In that case, the debtor tried to create a genuine issue of material fact about his intent by submitting an affidavit in response to the trustee's summary judgment motion in which he contradicted his own prior testimony that he understood the claim belonged to his bankruptcy estate and that he would rely on his bankruptcy attorney, not his personal injury attorney, for advice about his bankruptcy case, but the BAP refused to allow that effort.[22]

In the case before this Court, the Debtor has responded to the U.S. Trustee's motion for summary judgment, and has not tried to contradict his own prior testimony to create an issue of fact about his intent. Although the Court has not had the benefit of observing the Debtor's live testimony, the U.S. Trustee insists uncontroverted facts establish that the Debtor acted knowingly and fraudulently in selling his interest in the Chestnut Property. The Court believes other interpretations of the uncontroverted facts, as described above, are conceivable and preclude deciding the Debtor's state of mind through summary judgment. The Court believes a rational factfinder could conceivably conclude the Debtor did not act knowingly and fraudulently when he sold the Chestnut Property and disposed of the portion of the proceeds he received because he believed: (1) the trustee had decided not to contest his attorney's arguments against liquidating his interest in the Chestnut Property, (2) the absence from the public title records of any bankruptcy claim against the Chestnut Property meant his bankruptcy case would have no

---

[21] 2007 WL 130415, slip op. at *5-8 (6th Cir. BAP 2007).

[22] *Id.* at *6-7.

effect on the property, (3) the trustee's failure to mention the Chestnut Property in her turnover motion meant she was abandoning her claim against it, or (4) his attorney's failure to respond to the e-mail attachments reporting the plans to sell the Chestnut Property and the agreement to sell it meant he was free to sell his interest and use the proceeds as he wished.

The Court would remind the parties that in determining the U.S. Trustee's motion for summary judgment must be denied, the Court is not now acting as the trier of fact in this proceeding, but only as the arbiter of legal questions. The U.S. Trustee has submitted sufficient evidence to permit a reasonable factfinder to decide at trial that the Debtor acted knowingly and fraudulently in selling the Chestnut Property. The evidence is not sufficient, however, as it must be for the U.S. Trustee's motion to be granted, to *require* a reasonable factfinder to reach that conclusion. The Debtor's alternative explanations are not "so utterly implausible in light of conceded or irrefutable evidence that no rational person could believe [them]."[23]

**CONCLUSION**

For these reasons, the Court concludes the U.S. Trustee's motion for summary judgment must be denied. The Clerk's Office is hereby directed to set this proceeding for a status conference to discuss how to get the case ready for trial.

# # #

---

[23] *Chavin*, 150 F.3d at 728-29.